UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re
Robert M. Kraft,
        Debtor.

Chapter 7
Case No. 16-22095-svk

Associated Bank, N.A.,
        Plaintiff,
v.

Robert M. Kraft,
        Defendant.

Adversary No. 16-02233

**MEMORANDUM DECISION GRANTING PARTIAL SUMMARY JUDGMENT**

Associated Bank, N.A. (the "Bank") filed this dischargeability adversary proceeding against a personal guarantor despite having been paid virtually in full in a corporate Chapter 11 case pending in Chicago. The guarantor, Robert M. Kraft ("Kraft"), has answered and moved for summary judgment.

Summary judgment is appropriate if the pleadings and affidavits on file show there is no genuine dispute as to any material fact, and Kraft is entitled to judgment as a matter of law. *See* Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56; *Omega Healthcare Inv'rs, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 857 (7th Cir. 2007). Granting partial summary judgment can serve a useful function in narrowing the issues for trial. *See* Fed. R. Civ. P. 56(g); *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 606 (7th Cir. 2015) ("A request for partial summary judgment can serve a useful brush-clearing function even if it does not obviate the need for a trial."). The Court views all facts and draws all inferences in the light most favorable to the Bank as the non-moving party. *Omega Healthcare Inv'rs, Inc.*, 475 F.3d at 857.

## Background and Facts

The Complaint alleges that the Bank made loans to World Marketing Holdings, LLC ("World Marketing"), guaranteed by Kraft and others. In connection with the loans, in October 2014, Kraft signed an "Equity Certificate" stating that members identified on an exhibit had made cash capital contributions in the aggregate amount of $3 million in exchange for their membership interests in World Marketing. (Complaint, Exhibit D, Docket No. 1-1 at 72.) Apparently, only $2 million of the $3 million had been contributed by the time Kraft signed the Certificate, and $1 million of that was a short-term loan. (Affidavit of Jiri Mikl at ¶¶ 18-20; Exhibits J – L, Docket Nos. 19-1; 19-11 – 19-13.) Kraft testified that he confirmed with both the investors themselves and the CFO of World Marketing that the full $3 million in equity contributions had been paid. He also talked to a Bank officer, Mike Andrade. He described the short-term loan as "a short-term loan to be taken out by an equity contribution." (Deposition Transcript, Docket No. 19-16 at 11 – 12, 14.)

Kraft was the CEO of First Edge Solutions, Inc. ("First Edge"), and the Bank also alleges that World Marketing made unauthorized distributions to First Edge in violation of a provision in the credit agreement. (Complaint, Docket No. 1 at 5.) But Kraft stated that First Edge was a supplier or vendor of World Marketing, and the payments were for marketing, re-branding and software. (Deposition Transcript, Docket No. 18-2 at 264.) And Kraft points out that First Edge does not meet the definition of "subsidiary" in the loan documents, although he did sign a forbearance agreement acknowledging that some payments to First Edge constituted events of default. (Brief, Docket No. 18-4 at 5-6; Complaint, Exhibit F, Docket No. 1-1 at 90.)

On September 28, 2015, World Marketing's subsidiaries (the "World Companies") filed Chapter 11 petitions in the Northern District of Illinois, and the confirmed plan provides for

2

payment in full of the Bank's claim. (Motion for Summary Judgment, Exhibit G, Docket No. 18-2 at 95.) On April 6, 2016, the Bankruptcy Court authorized payment in full of the Bank's allowed secured claim, and the Bank received $1,092,390.58 from the Chapter 11 auction of the World Companies' assets. (Motion for Summary Judgment, Exhibit D – E, Docket No. 18-2 at 77, 79.) The Bank labels the payment a "partial payment," and contends that principal of $1.34, interest of $0.06, costs of $61.65, and attorneys' fees of $671,347.87 remain due. (Affidavit, Docket No. 19-1 at 6.) However, the plan provides a reserve of $1,500,000 to provide full payment of the Bank's claim. (Docket No. 19-10 at 121.)

The Bank also contends that two lawsuits against the Bank in the World Companies bankruptcy could cause the Bank to refund some of the "partial" payment. The Court can take judicial notice of the pleadings in these suits. The American Funds Service Company ("AFS") adversary proceeding accuses the Bank of offsetting approximately $600,000 in a postage account that the World Companies allegedly held in trust for AFS. The Bank is vigorously defending the AFS litigation, but even assuming that AFS succeeds on its claim, the Bank would be entitled to payment from the reserve account up to payment in full of the Bank's claim as provided in the confirmed plan.

In the second action, the World Companies Creditors' Committee seeks to recover loan repayments and guarantees as fraudulent transfers or preferences on the theory that the World Companies were or became insolvent when the Bank received its collateral and guarantees. The Bank has moved for summary judgment, and a hearing is scheduled for May 17, 2017. In support of its motion, the Bank represented: "In sum, Debtors could not have been insolvent as of October 17, 2014. Debtors' own balance sheets report they had a net worth of $15 million, plus contingent assets of another $20 million in the form of their co-obligors under the Guaranty.

The Committee will never be able to meet the burden of coming forward with evidence that entities reporting a *net* worth of $35 million were insolvent." (Memorandum in Support of Summary Judgment, Bankr. N.D. Ill. Adv. No. 16-00019, Docket No. 57-1 at 9.) The sums stated do not include the $1 million equity infusion in World Marketing at closing. (*Id*. at 8.)

Kraft's allegedly false representations on the Equity Certificate and the transfers to First Edge form the basis for the Bank's complaint that Kraft's debt on his guaranty is nondischargeable. The Bank alleges three alternative legal theories: fraud under § 523(a)(2)(A); false financial statement under § 523(a)(2)(B); and willful and malicious injury to the Bank or its property under § 523(a)(6). The Court will address the Equity Certificate claim and the First Edge transfers under each theory.

## Equity Certificate

The Bank has alleged that Kraft's debt is nondischargeable under §§ 523(a)(2)(A) and (B), but subsections (A) and (B) of § 523(a)(2) are mutually exclusive. *Landmark Credit Union v. Sharp*, 561 B.R. 673, 679 (Bankr. N.D. Ill. 2016). Section 523(a)(2)(A) makes nondischargeable a debt "obtained by . . . false pretenses, a false representation, or actual fraud, <u>other than a statement respecting the debtor's or an insider's financial condition</u>." 11 U.S.C. § 523(a)(2)(A) (emphasis supplied). Section 523(a)(2)(B) provides that a debt is not dischargeable if the debtor obtained the debt with a written statement "(i) that is materially false; (ii) respecting the debtor's or an insider's[1] financial condition; (iii) on which the creditor . . . reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." The only written statement that Kraft is alleged to have provided is the Equity Certificate. If the Equity Certificate is a statement regarding World Marketing's financial condition, then

---

[1] World Marketing is an insider of Kraft, who was the owner of World Marketing's managing member. (*See* Deposition Transcript, Docket No. 19-16 at 6.)

4

§ 523(a)(2)(A) does not apply, and the Bank must meet the elements of § 523(a)(2)(B).

The Bankruptcy Code does not define "statement respecting financial condition." Some courts have adopted a narrow definition, limiting such a statement to "a balance sheet and/or profit and loss statement or other accounting of an entity's overall financial health and not a mere statement as to a single asset or liability." *Sampson Lumber Co., Inc. v. Tucci (In re Tucci)*, 462 B.R. 278, 283 (Bankr. D. Mass. 2011) (quoting *Bal-Ross Grocers, Inc. v. Sansoucy (In re Sansoucy)*, 136 B.R. 20, 23 (Bankr. D.N.H. 1992)) (statement of ownership of single asset was not an assessment of the debtor's financial health). Other courts adopt a broader definition holding that a "formal financial statement" is not required. *Engler v. Van Steinburg*, 744 F.2d 1060, 1060-61 (4th Cir. 1984) (debtor's statement that he owned property free and unencumbered related to his financial condition). The Seventh Circuit has not decided the issue, but has noted that most bankruptcy courts in the Circuit adopt the narrow view. *See Stelmokas v. Kodzius*, 460 F. App'x 600, 603-04 (7th Cir. 2012). While arguments could be made both ways, the Court concludes that a certification about the amount of equity contributions to be made to World Marketing is a statement regarding World Marketing's financial condition. Accordingly, Bankruptcy Code § 523(a)(2)(B) applies.

Turning to the remaining elements of that subsection, it is apparent that the representation that $3 million of contributions had been made when only $2 million had been contributed is a material misstatement. And the Bank has filed an affidavit stating that it would not have made the loan had it known about the inaccuracy of the Equity Certificate, establishing reliance.[2]

---

[2] For purposes of summary judgment, the Court assumes the loans were "obtained by" reliance on the false financial statement, but given the Bank's representations in the World Companies Creditors' Committee litigation that the debtors and guarantors had a total of $35 million net worth, this assumption could well be challenged at a trial.

But to prevail, the Bank must prove by a preponderance of the evidence that Kraft signed the Equity Certificate with the intent to deceive the Bank. *See Grogan v. Garner*, 498 U.S. 279 (1991). Kraft denies intending to deceive the Bank in issuing the certificate. He testified that he personally confirmed with the members and with the World Marketing CFO that the full $3 million in equity contributions had been made. He also mentioned talking to the Bank officer about them. "To stave off summary judgment, once the moving party has claimed an absence of evidence supporting an element of the non-moving party's case, the non-movant must point to facts in the record showing there is a genuine issue for trial." *Fischer Inv. Capital, Inc. v. Cohen (In re Cohen)*, 507 F.3d 610, 613 (7th Cir. 2007) (citing *Scaife v. Cook County*, 446 F.3d 735, 739 (7th Cir. 2006)). The only response the Bank has made to Kraft's testimony is Kraft's admission that he did not check the balance sheet or bank account to confirm receipt of the contributions. Under the circumstances, these admissions do not raise a genuine dispute about whether Kraft had the requisite intent to deceive the Bank. Kraft spoke to the company CFO and the Bank officer concerning the contributions; either the CFO or the Bank officer would logically be expected to check the bank account for evidence that the funds had been deposited. The Bank has not offered any affidavit or exhibit suggesting that a balance sheet was created that showed the status of the contributions. Therefore, the Bank has not shown that there is an issue for trial about Kraft's intent, and the Bank's claim regarding Kraft's conduct in signing the Equity Certificate does not meet the required elements of § 523(a)(2).

The Bank also asserts that the debt is not dischargeable under 11 U.S.C. § 523(a)(6) as debt for a willful and malicious injury. "Willfulness" requires that the debtor have committed a deliberate or intentional act; a reckless or even grossly negligent act is not enough. *See Kawaauhau v. Geiger*, 523 U.S. 57 (1998) (nondischargeability under § 523(a)(6) takes a

6

Case 16-02233-svk    Doc 21    Filed 04/13/17    Page 6 of 10

deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury; thus, negligently or recklessly inflicted injuries are not covered by § 523(a)(6)). The Bank did not respond to the summary judgment motion with any evidence suggesting Kraft's misrepresentation on the Equity Certificate was a deliberate or intentional act. To the contrary, Kraft confirmed the status of the contributions with the investors and the CFO and had discussions with the Bank officer. At best, the Certificate was issued negligently; Kraft's conduct does not rise to the level of an intentional tort as is required for the discharge exception to apply. Any obligation to the Bank arising out of Kraft's representations on the Equity Certificate is dischargeable in Kraft's bankruptcy.

## Discharge of Debt due to Unauthorized Transfers

Less than a year after the credit agreement was signed, the Bank issued a notice of default alleging various covenant violations, including that World Marketing made an unauthorized distribution of $290,000 to First Edge. (Complaint, Exhibit E, Docket 1-1 at 75.) The parties then entered into a forbearance agreement in which Kraft, the other guarantors and World Marketing acknowledged the default. (*Id.*, Exhibit F, Docket 1-1 at 79.) The Bank alleges that Kraft drastically understated the unauthorized distributions to First Edge by almost $1 million, to fraudulently induce the Bank to enter into the forbearance agreement and make additional loan advances. (Complaint, Docket No. 1 at 7 – 8.) Kraft replies that First Edge was not a subsidiary of World Marketing, and therefore the provisions of the credit agreement prohibiting advances do not apply to First Edge. Also, in his deposition, Kraft stated that the payments to First Edge were for marketing, re-branding and software. (Deposition Transcript, Docket No. 18-2 at 264.)

First, the representation about the amount of the advances to First Edge does not qualify as a statement respecting the debtor's or an insider's financial condition, and Bankruptcy Code

7

§ 523(a)(2)(B) does not apply.  Thus, the issue is whether the representation could constitute false pretenses, a false representation, or actual fraud under § 523(a)(2)(A) or a willful and malicious injury to the Bank or its property under § 523(a)(6).  The Court concludes that § 523(a)(6) does not apply.  Even assuming that Kraft made misrepresentations concerning the payments to First Edge, those misrepresentations do not rise to the level of intentional torts.  *See Kawaauhau v. Geiger*, *supra*.

However, fraudulently inducing a forbearance agreement by false representations can constitute false pretenses, false representations or actual fraud under § 523(a)(2)(A).  *Ojeda v. Goldberg*, 599 F.3d 712 (7th Cir. 2010).  To establish this exception, the Bank must prove that "(1) it had valuable collection remedies at the time of the misrepresentation, (2) it did not exercise those remedies based upon the misrepresentation, and (3) that the remedies lost value during the extension period."  *Id.* at 719 (internal quotations and citations omitted); s*ee also Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011) (creditor must prove debtor made a false representation or omission that he either knew was false or made with reckless disregard for its truth; he made the misrepresentation or omission with an intent to deceive or defraud; and the creditor justifiably relied on the misrepresentation or omission).  In *Ojeda*, at the time of the forbearance, the debtors did not tell the creditors that they had sold a McDonald's restaurant and that they had mortgaged their house to invest in another restaurant operation.  They continued to correspond with the creditors using the McDonald's restaurant stationery.  When the debtors filed bankruptcy, the McDonald's restaurant was gone, and the creditors were unlikely to recover anything.

The facts here are far more nuanced.  The record shows that Kraft represented in the forbearance agreement that no defaults existed other than the defined "subject defaults," and the

8

Bank now contends that additional advances to First Edge also constituted defaults. But Kraft's motion for summary judgment disputes whether the advances to First Edge violated the credit agreement in the first place. In its original default letter, the Bank stated that World Marketing violated section 11.4 of the credit agreement. In relevant part, that section prohibits World Marketing (and its Subsidiaries) from (a) making any distribution to any holders of its Equity Interests; (b) purchasing or redeeming any Equity Interests; or (c) paying any management fees or similar fees to any Equity Holders or Affiliate thereof. As shown on the Equity Certificate, First Edge never held "Equity Interests" in World Marketing. Nor could the payments be characterized as management fees or similar fees. Accordingly, it appears that the Bank's original notice of default concerning the First Edge advances was erroneous.

Nevertheless, in the forbearance agreement, Kraft acknowledged that $290,000 in payments was "unauthorized" and constituted an event of default. In his deposition, he now claims that the payments to First Edge were for services and software. Accordingly, assuming the event of default did not exist, the question is whether Kraft should be bound by his admission that it did exist and then liable for failing to disclose that World Holdings made additional advances to First Edge. Under the circumstances, it seems highly unlikely the Bank will prevail on this issue, but the Court determines that questions of fact remain. The limited disputed issues for trial are whether the omission of the First Edge payments is material, Kraft's intention as to omitting the existence of the other payments, and whether the Bank justifiably relied on those omissions, having apparently erred in its premise that the original payments constituted a default under the credit agreement.

**Conclusion**

The Court concludes that Kraft's motion for summary judgment should be granted in part and denied in part. The Bank's claims that the representations in the Equity Certificate form the basis for an exception to Kraft's discharge under § 523(a)(2) or § 523(a)(6) are dismissed. The claims that the omission of the First Edge payments establish that any debt owed to the Bank is nondischargeable under § 523(a)(2)(B) or § 523(a)(6) are denied. The only claim remaining for trial is whether the omission of the First Edge payments in the negotiation of the forbearance agreement constitutes false pretenses, false representations or actual fraud under § 523(a)(2)(A).

Given the status of the Committee adversary proceeding against the Bank in the World Companies bankruptcy, conducting a trial on these limited issues is premature. If the Bank is successful in its summary judgment motion in that litigation, the Bank's remaining claim, consisting mainly of attorneys' fees, will be paid in full from the reserve fund. Therefore, the trial in this case will wait until that summary judgment motion is decided. At that time the Court also will consider Kraft's requests for sanctions. An order will be entered granting in part and denying in part Kraft's motion for summary judgment.

Dated: April 13, 2017

By the Court:

Susan V. Kelley
Chief U.S. Bankruptcy Judge